UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA        :
                                :
v.                              :   CASE No. 8:18-CR-236-T-33TGW
                                :
DION FISHER                     :
_____ :

## REPORT AND RECOMMENDATION

The defendant, Dion Fisher, has filed a motion to suppress "all items seized from ... [10124 Nassau Court in Seminole] and [his] person on February 15, 2018" (Doc. 111). He contends that, although law enforcement had a valid warrant to search his residence, they unlawfully detained him during the search, in violation of his Fourth Amendment rights.

After conducting an evidentiary hearing and evaluating the parties' memoranda, it is clear that there was no Fourth Amendment violation because law enforcement had (1) a valid search warrant to seize the property from the defendant's residence and (2) probable cause to arrest him. Furthermore, even if the police detained the defendant in violation of the Fourth Amendment, the defendant indisputably is not entitled to the suppression of evidence seized from his home because it was legally acquired

pursuant to a valid search warrant.   Accordingly, I recommend that the defendant's Motion to Suppress (Search of Home 10124 Nassau Court and Person) (Doc. 111) be denied.

I.

On June 13, 2018, the court issued a search warrant for 10124 Nassau Court in Seminole, Florida, which is the defendant's personal residence (see 18-mj-1157-T-AAS).   As pertinent here, the search warrant application stated probable cause to believe that the defendant was engaging in, among other unlawful activity, fentanyl trafficking at his residence.[1] Detective Dan Rivera, a task force agent with the DEA, submitted an affidavit outlining several alleged illegal drug transactions between the defendant and confidential sources for pills that looked like oxycodone, but contained fentanyl (id., Rivera Aff., pp. 12-15).   The affidavit stated further that the defendant manufactured fentanyl pills at his personal residence, and used the residence as the basis of his operation for fentanyl trafficking (id. at pp. 19-21).

---

[1]More specifically, the defendant allegedly "import[ed] ... illegal substances from China and Thailand, including fentanyl.... The conspirators manufacture[d] pills, designed to look like oxycodone prescription pills that contain fentanyl and distribute[d] these pills to their customers via face-to-face transactions and the U.S. Postal Service" (id., Aff. of Dan Rivera, ¶4).

On February 15, 2018, law enforcement executed the search warrant at 10124 Nassau Court in Seminole, Florida ("search warrant"). Among other things, law enforcement was looking for "[c]ontrolled substances ...[such as] fentanyl, oxycodone, and fentanyl analogues; [and] [d]rug distribution paraphernalia" (8:18-mj-1157-T-AAS, Attachment B).

An evidentiary hearing on the defendant's motion detailed the circumstances surrounding the execution of the search warrant. The defendant and his counsel appeared at the hearing, as well as counsel for the Government. Deputy Matthew Schultheis was the only witness to testify.[2]

Schultheis, who is a law enforcement officer with the patrol division of the Pinellas County Sheriff's Office (PCSO), was briefed on the morning of February 15, 2018, regarding the execution of the search warrant at the defendant's residence. During the briefing, there was an overview of the case and a review of the defendant's criminal history. Dep. Schultheis understood that his role was to detain the defendant during the execution of the search warrant. Specifically, he was instructed to wait for the defendant

---

[2]The following statement of facts is based on Dep. Schultheis's testimony, which I accept as credible. Thus, Dep. Schultheis was thoughtful in his responses, and candidly admitted when he could not recall facts. Furthermore, some of his testimony was arguably favorable to the defendant. Significantly, the defendant did not present any evidence controverting Dep. Schultheis's testimony.

to leave his residence and conduct a traffic stop of the vehicle. Consistent with this plan, Dep. Schultheis arrived near the defendant's residence at about 8 a.m. There were also other law enforcement vehicles in the area. Dep. Schultheis parked his patrol vehicle on 102nd Avenue, a few feet from the intersection of 102nd Avenue and Nassau Court. The defendant's residence was the third house from the intersection on Nassau Court, about 30-35 feet away.

Dep. Schultheis spent several hours waiting for the defendant to leave his residence. At about noon, a surveillance detective radioed that the defendant left his residence in a vehicle. Dep. Schultheis turned on his patrol lights and conducted a traffic stop immediately after the vehicle turned right on 102nd Avenue. Dep. Schultheis specified that he stopped the car about 5-7 feet past the stop sign located at the west corner of 102nd Avenue and Nassau Court.

The defendant, whose identity Dep. Schultheis confirmed with a picture, was sitting in the back seat. He told the defendant to exit the car, after which Dep. Schultheis conducted a pat-down of the defendant for officer safety. He retrieved two cellular telephones. Dep. Schultheis had the defendant sit in the back seat of the patrol car, and he parked his patrol car in

-4-

the median on 102nd Avenue, approximately 40 feet away from the defendant's residence.

While in the patrol car, the defendant was not handcuffed. The police officers told the defendant that a search warrant was being executed at his home, but that they did not have a copy of the warrant to give him. Dep. Schultheis saw Hazmat and search teams respond to the defendant's residence about 45 minutes after his traffic stop. Fire trucks were also present as a precaution. The right lane of 102nd Avenue, and Nassau Court, were blocked off.

The search was conducted by members of the Drug Enforcement Administration and the PCSO. They entered the house wearing Hazmat suits.[3] Dep. Schultheis could see the defendant's residence from his patrol car, but he could not see the front door and the search team enter the house.

---

[3]There was the threat of dangerous drugs, such as fentanyl, and contaminated chemicals and fumes on the premises. Fentanyl is up to 50 times more potent than heroin and "can be lethal and is deadly at very low doses." www.dea.gov/press-releases/2017/06/10. Significantly, law enforcement may unknowingly come into contact with fentanyl as it "can be absorbed through the skin or accidental inhalation or airborne powder can also occur." Id.

Law enforcement seized from the residence, among other things, pills, a digital scale and a Tec 9 firearm[4] (Doc. 111, p. 2; Doc. 117, p. 2).

The defendant remained in the patrol car with Dep. Schultheis for the duration of the search, which was several hours. Dep. Schultheis did not have any discussion with the defendant, other than to check on his well-being. Dep. Schultheis gave the defendant pizza and Gatorade, and took him to the PCSO when he needed to use the restroom. At about 7:00 p.m., Dep. Schultheis was told to arrest the defendant. He handcuffed the defendant, and another law enforcement officer took the defendant to the Pinellas County Jail.

The defendant is charged in a multiple-count indictment with conspiracy to possess, with intent to distribute, and manufacture, a substance containing fentanyl, a schedule II controlled substance (Doc. 1). The indictment also alleges that the defendant possessed, with intent to distribute, pentylone, (another schedule II controlled substance), and engaged in illegal

---

[4]"A TEC-9 ... is an 'assault pistol.'" www.gun.laws.com/tec-9. It "fires 9mm rounds and is semi-automatic and blowback operated" Id.

monetary transactions (Doc. 1).[5]  Counsel was appointed to represent the defendant (Docs. 25, 61).

The defendant contends in his Motion to Suppress that he is entitled to the suppression of "all items seized from [his] home and person on February 15, 2018," based on an alleged violation of his Fourth Amendment rights (Doc. 111, p. 5).  Although the defendant does not challenge the validity of the search warrant, he contends that law enforcement exceeded their lawful authority to detain him during the search (see Doc. 111).  The defendant also alleges that the length of his detention was unreasonable, and that he was not given a copy of the search warrant (id. at p. 5).

The Government contends that there is no basis for suppressing the evidence obtained as a result of the valid search warrant (Doc. 117).  Furthermore, it argues that the defendant's detention was lawful because he was held in the immediate vicinity of his home during the search. The motion was referred to me, and an evidentiary hearing was conducted (see Doc. 138).

---

[5]In sum, it is alleged that, since October 2013, the defendant had "been participating in an ongoing conspiracy to manufacture and distribute illegal narcotics, mostly fentanyl; launder the proceeds of their narcotics sales through various businesses and business bank accounts that they control and, by using the narcotics proceeds to purchase assets, to commit tax evasion" (8:18-mj-1157-T-AAS, Rivera Aff., ¶4; see also id., ¶8).

## II.

The Fourth Amendment provides that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The movant has the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure. Rakas v. Illinois, 439 U.S. 128, 132 (1978).

Although the parties viewed this case as involving Fourth Amendment subtleties, it seems to me that it is this simple: law enforcement executed a valid search warrant, and, therefore, law enforcement's seizure of property pursuant to that search warrant was clearly lawful. The defendant's argument to the contrary, which is unsupported by any legal authority, is frivolous. Furthermore, the police lawfully detained the defendant during the the search, as there was probable cause to arrest him.

## III.

The defendant seeks suppression of all evidence obtained from his residence and person on February 15, 2018 (Doc. 111). As discussed infra, pp. 14-16, the defendant states no basis for suppressing the items seized pursuant to the search warrant. Furthermore, the defendant made no statements during the detention, and the only items found on his person were

two cellular telephones, which the Government indicated at the hearing did not contain material evidence.  Consequently, there is arguably nothing to suppress as a result of the defendant's detention, either.  Regardless, his detention was lawful.

A.    As the defendant acknowledges, law enforcement may detain, without probable cause to arrest, occupants within the "immediate vicinity" of the premises to be searched. Bailey v. United States, 568 U.S. 186, 201 (2013).  This rule is justified by officer safety, facilitating the completion of the search, and preventing flight. Id. at 194.  However, "[o]nce an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe." Id. at 201.

In this matter, Dep. Schultheis testified that he stopped the defendant about 40 feet away from the defendant's residence.  The defendant argues that this was "beyond the immediate vicinity" of his home (Doc. 111, p. 4).  The Government counters that, at 40 feet away, the defendant was in the immediate vicinity of his residence, and adds that detaining the defendant at his residence would have "posed a real threat to the safe and efficient execution of the search warrant, especially in light of the fact that law

-9-

enforcement had to enter the premises in protective chemical gear" (Doc. 117, pp. 4-5).

Neither party provided apposite legal authority as to the scope of "immediate vicinity," and its parameters are not well developed. In this respect, the Supreme Court held in <u>Michigan</u> v. <u>Summers</u> that an occupant's detention on the sidewalk in front of his residence is within the immediate vicinity, and <u>Bailey</u> v. <u>United States</u> established that a detention almost one mile away from the residence is not. 452 U.S. 692, 702 n.16; 568 U.S. at 201. However, what is acceptable between these benchmarks is unclear.

The Supreme Court advocates, in closer cases, a totality of the circumstances approach. Thus, courts may "consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." <u>Bailey</u> v. <u>United States</u>, 568 U.S. at 201.

Dep. Schultheis testified that he stopped the defendant about 40 feet away from his residence. Although this is not far, the detention was not within the lawful limits of the premises; Dep. Schultheis could not see the

entrance to the defendant's residence; and there were barriers placed in the streets near the defendant's home that would have blocked the defendant from reentering his residence. Thus, the three factors specified by the Supreme Court do not support the Government's position that the defendant was detained within the immediate vicinity of his residence.[6]

On the other hand, those factors are not dispositive, and this case does not present a Bailey-type circumstance where the detention was nearly one mile from the suspect's residence. Furthermore, although the Government did not bring an agent in charge of the investigation to explain the plan, it was clearly reasonable for law enforcement to allow the defendant to leave the premises before executing the search warrant for officer safety reasons (see Doc. 117, pp. 4-5). Thus, during the briefing on this case, law enforcement were made aware of the defendant's criminal history, which included possession of an AK-47 type assault rifle (see 8:18-mj-1157-T-AAS, Rivera Aff., ¶12). Notably, law enforcement seized from the

---

[6]Furthermore, language indicates that "immediate vicinity" is to be narrowly defined. Thus, the Supreme Court stated in Bailey that "it is necessary to confine the [immediate vicinity] rule to ... *where the search is being conducted.*" 568 U.S. at 197 (emphasis added). Additionally, the Eleventh Circuit commented that the immediate vicinity rule does not apply "in situations where officers detain a suspect *away from the scene of the search.*" U.S. v. Adigun, 567 Fed. Appx. 708, 712-13 (11th Cir. 2014) (emphasis added).

defendant's residence an assault pistol (Doc. 111, p. 2; Doc. 117, p. 2). Furthermore, there was the threat of dangerous drugs, such as fentanyl, and contaminated chemicals and fumes on the premises, which required extraordinary protective measures (Doc. 117, pp. 1, 5). Due to those concerns, law enforcement entered the house wearing Hazmat protective gear. These circumstances also justify the length of the detention (id. at 5).

Although the parties focused on whether the defendant was detained in immediate vicinity of his residence, it is not necessary to make that determination because, in all events, there was no violation of the defendant's Fourth Amendment rights. Thus, even if the defendant was detained outside the immediate vicinity of the search area, the detention may be "justified by some other rationale." Bailey v. United States, 568 U.S. at 202; United States v. Rucker, 588 Fed. Appx. 943, 946 (11th Cir. 2014). In this case, the detention is justified because there was probable cause to arrest the defendant when Dep. Schultheis stopped him.

The affidavit supporting the search warrant of the defendant's residence also establishes probable cause to arrest the defendant for, among other crimes, illegal drug trafficking. For example, detective Rivera's affidavit includes evidence that the defendant sold confidential sources

-12-

thousands of dollars of counterfeit oxycodone pills, which later tested positive for fentanyl (see 8:18-mj-1157-T-AAS, Rivera Aff., pp. 12-21). The affidavit also contains evidence that the defendant "cooked," i.e., manufactured, Fentanyl pills and sold powder fentanyl (Rivera Aff., pp. 18, 19). This information unquestionably states probable cause to arrest the defendant, even if that was not the officer's rationale for detaining the defendant or the officer believed probable cause was lacking. See United States v. Clark, 559 F.2d 420, 425 (5th Cir. 1977) ("[T]he scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer," but by an objective determination whether probable cause was present.); see, e.g., United States v. Munoz, 957 F.2d 171 (5th Cir. 1992).

In Munoz, the appellant, and co-defendant Garcia, arrived at Garcia's residence while police officers were executing a search warrant. Id. at 172. The officers did a pat-down of the men (during which they found a bag of cocaine and cash on Munoz), and had them wait in the kitchen during the search. Id. Thereafter, the police arrested them, and Munoz moved to suppress the seizure, arguing there was not probable cause to search or arrest him. Id. The Fifth Circuit upheld the district court's denial of the motion to

suppress, stating that "before the issuance of the [search] warrant [for Garcia's residence], the informant provided the police with ample information to establish probable cause to arrest and search ... Munoz." Id. at 172-73.

Analogously, in this case, the affidavit supporting the search warrant similarly contained evidence from confidential sources establishing that the defendant was engaging in, among other illegal conduct, drug trafficking. See id.; cf., Birchfield v. North Dakota, 136 S.Ct. 2160, 2181 (2016) ("In order to persuade a magistrate that there is probable cause for a search warrant, the officer would typically recite the same facts that led the officer to find that there was probable cause for arrest...."). Accordingly, the defendant was lawfully detained because at that point law enforcement had probable cause to arrest him.[7] Therefore, the defendant's contention that he was unlawfully detained — which is the sole basis for the motion to suppress — is meritless.

B.    Finally, assuming arguendo that law enforcement improperly detained the defendant (which it did not), there is no basis to

---

[7]Additionally, the fact that law enforcement completed the search of the residence before arresting the defendant does not vitiate probable cause. See United States v. Clark, 559 F.2d 420, 425 (5th Cir. 1977) ("Of course, police officers are not required to ... arrest at the exact moment probable cause arises.").

-14-

suppress evidence seized from his residence, as it was obtained pursuant to a valid search warrant.

The Supreme Court explained that "[s]uppression of evidence...has always been our last resort, not our first impulse," and that the "'costly toll' upon truth seeking and law enforcement objectives presents a high obstacle for those urging [its] application." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citation omitted). Consequently, whether suppression is appropriate in a particular context is separate from the question whether the Fourth Amendment was violated. Id. at 591-592.

For example, "the independent source doctrine" permits "admission of evidence that has been discovered by means wholly independent of any constitutional violation." Nix v. Williams, 467 U.S. 431, 443 (1984). The court considers "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 442 (citation omitted).[8]  When the challenged evidence has an independent source,

---

[8]Pursuant to the independent source doctrine, information gained as a result of the allegedly illegal conduct is excised to determine whether probable cause for the search or seizure exists separate from that information. In this case, there was no information gained from the alleged illegal conduct that was used to obtain the search warrant. In fact, the

exclusion of such evidence would improperly place the police in a worse position than they would have been in absent any error or violation. Id. at 443, 445.

In this matter, law enforcement would have obtained the evidence from the defendant's residence, even assuming the truth of the alleged misconduct. Thus, the purportedly unlawful detention occurred after and, therefore, contributed no information to the issuance of, the search warrant. The alleged wrongdoing in this case is even more attenuated than in a typical application of the independent source doctrine, thereby rendering the motion to suppress this evidence frivolous.

Significantly, the defendant does not dispute the validity of the search warrant. Therefore, suppression of that evidence would add nothing to the integrity of the criminal trial. Moreover, the defendant did not present any legal authority, or cogent argument at the hearing, that suppressing the evidence seized from the residence pursuant to a valid search warrant is an appropriate remedy. On the other hand, suppression would place the Government in a worse position than they would have been absent the purportedly illegal detention, which further establishes that suppression is

---

search warrant was obtained before the alleged illegal conduct occurred.

unwarranted in this circumstance. See Nix v. Williams, 467 U.S. at 443. In sum, the evidence obtained pursuant to the search warrant is unrelated to the alleged illegality, and, therefore, there is no cognizable basis for its suppression.

## IV.

Finally, the defendant argues that law enforcement violated Rule 41(f), F.R.Crim.P., because he did not receive a copy of the search warrant when he requested it (Doc. 111, p. 5). This argument is baseless.

Rule 41(f)(1)(C) provides that

> [t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

(emphasis added). In this case, there is no evidence presented that this paperwork was not left at the defendant's residence. Therefore, the defendant has not shown a basis for finding that law enforcement violated this rule, and he certainly has not shown that suppression of evidence is an appropriate remedy for such a violation.

V.

In sum, it is undisputed that law enforcement legally seized the property from the defendant's residence pursuant to a valid search warrant. Furthermore, regardless of whether the defendant was detained in the immediate vicinity of his residence during the search, law enforcement had probable cause to arrest the defendant even before Dep. Schultheis stopped him that day. Therefore, this motion is meritless. Accordingly, I recommend that the defendant's Motion to Suppress (Search of Home 10124 Nassau Court and Person) (Doc. 111) be denied.

Respectfully submitted,

*Thomas G. Wilson*

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: MAY 3 , 2019

NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.